# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:

Joseph G. DuMouchelle and Melinda
J. Adducci,

     Debtors.

_____/

Teodor Gelov,

     Plaintiff,

v.

Melinda J. Adducci,

     Defendant.

_____/

Chapter 7

Case No. 19-54531
Honorable Lisa Gretchko

Adversary Pro. No. 20-04172

## PLAINTIFF'S BRIEF (1) IN RESPONSE TO DEFENDANT'S ASSERTION OF SPOUSAL PRIVILEGE; AND (2) IN SUPPORT OF (a) DEFENDANT'S WAIVER OF SPOUSAL PRIVILEGE AND (b) WAIVER OF ATTORNEY CLIENT PRIVILEGE AND RESERVATION OF RIGHTS TO OBTAIN TESTIMONY OF DEFENDANT'S FORMER COUNSEL

Plaintiff, Teodor Gelov ("Plaintiff"), by his undersigned counsel, hereby submits his *Brief (1) in Response to Defendant's Assertion of Spousal Privilege; and (2) in Support of (a) Defendant's Waiver of Spousal Privilege and (b) Waiver of Attorney Client Privilege and Reservation of Rights to Obtain Testimony of Defendant's Former Counsel* (the "Brief"):

## I. INRODUCTION

This Brief is submitted under the *Stipulated Order Setting Schedule Regarding Privilege Issues Pertaining to Discovery of ESI* [ECF No. 255] (the "Discovery Dispute Scheduling Order").

The Parties have completed their respective review of the ESI Files[1] pursuant to the Discovery Dispute Scheduling Order. Plaintiff is seeking a determination that Defendant's assertion of spousal privilege as to records that Defendant identified as business communications between her and Joseph is not applicable.

Second, Plaintiff is seeking a determination that the asserted spousal privilege does not attach to communications that were made in furtherance of a crime, and based on Joseph's criminal adjudication, ESI Files that relate to the promissory note transaction between Plaintiff and the DuMouchelle parties[2] (the

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Discovery Dispute Scheduling Order or *Plaintiff's Motion to (1) Compel Production of ESI Records (2) Reopen Discovery and (3) Adjourn Trial* filed in the Adversary Proceeding of *Ritter v. Adducci* Case No. 20-04381 (Bankr. E.D. Mich.) (the "Ritter AP") [ECF No. 188].

[2] The transaction involving the promissory note at issue in this Adversary Proceeding that is dated August 3, 2018 and was executed by Defendant, Joseph, and DuMouchelle Jewellers in the amount of $1,800,000.00 and payable to Plaintiff (the "Note") and subject to Plaintiff's security interest in certain jewelry items described in Exhibit A to the Note and as described in *Plaintiff's Second Amended Complaint* [ECF No. 130] pp. 3–6.

"<u>Promissory Note Transaction</u>") and other matters covered in the criminal adjudication are discoverable.

Third, Plaintiff seeks a determination that Defendant waived her attorney-client privilege as to her communications with her former counsel Dennis Egan and Joel Harris ("<u>Former Counsel</u>") so that Plaintiff may, at his discretion, take deposition and trial testimony of Former Counsel regarding their knowledge of Defendant's involvement in the Promissory Note Transaction.

## II.   ARGUMENT

### Choice of Law

Although state law may determine privilege applicability in federal court under certain circumstances, no such circumstances exist here. This Court is addressing a federal question pursuant to federal law and thus, federal common law governs privilege claims in this case.

Federal Rule of Bankruptcy Procedure 9017 provides that the Federal Rules of Evidence apply in a bankruptcy case.[3] Fed. R. Evid. 501 makes clear that **"[p]rivileges in cases asserting federal law claims are governed by federal common law except as modified by the Constitution, federal statute, or a rule prescribed by the Supreme Court."** *Wilcox v. Portfolio Recovery Assocs., LLC*, 2023 U.S. Dist. LEXIS 104151, *3 (referring to Fed. R. Evid. 501); *see Est. of Crookston v. United*

---

[3] Fed. R. Bankr. P. 9017

*States*, 2023 U.S. Dist. LEXIS 226180, *8 (D. Utah Dec. 19, 2023) ("Federal law governs privilege claims where federal law provides the rule of decision."). However, Fed. R. Evid. 501 then provides "[b]ut in a civil case, state law governs privilege regarding a claim or defense *for which state law supplies the rule of decision*."[4] (emphasis added). Michigan law does not supply the rule of decision in this case. The underlying fraud was federal wire fraud, tried in federal court under 18 U.S.C. § 1343, for which Joseph's criminality was adjudicated.

Furthermore, this Court is adjudicating Defendant's dischargeability in a bankruptcy proceeding which is a federal question governed by 11 U.S.C. § 523 of the Bankruptcy Code. And while bankruptcy courts deciding 523 actions have reached into state law to provide meaning for terms not defined under federal law, this Court need not do so here. *See In re Mitchell*, 2019 Bankr. LEXIS 658, *18, 2019 WL 1054715 (Bankr. Dist. Idaho March 5, 2019) ("While the issue of dischargeability under § 523(a)(9) is exclusively a question of federal law, state law may provide the meaning of some terms that are not defined under federal law, such as 'intoxication' and 'motor vehicle'. *See In re Henney*, 451 B.R. 724, 737–38 (D. W.D. Mich. 2011) ("a federal court applying section 523(a)(9) should adopt the definition of 'intoxication' or 'intoxicated' which is supplied by the relevant State's law."). There is no outstanding element of fraud that must be proven. No word that

---

[4] Fed. R. Evid. 501

must be defined. The only question for the Court is the extent of Defendant's role in the fraud—which is question of fact—further indicating the necessity to produce all ESI Files withheld on the grounds of privilege.

Even if this Court determined state law was applicable, the Notes of Committee on the Judiciary for Fed. R. Evid. 501 clarify "[i]n any case, the statute or *rule which favors the reception of the evidence governs* and the evidence shall be presented according to the most convenient method prescribed in any of the statutes or rules to which reference is herein made."[5] (emphasis added). Restated in terms of this case, if Michigan common law were to govern privilege and if the enforcement of Michigan law disfavored reception of evidence that would otherwise be admitted under federal common law, pursuant to Fed. R. Evid. 501, federal common law would govern as it would be the most convenient method for evidence to be received.

Courts have also reinforced this position. *See United States v. King,* 73 F.R.D. 103, 105 (E.D.N.Y. 1977) ("A strong policy of comity between state and federal sovereignties impels federal courts to recognize state privileges *where this can be accomplished at no substantial cost to federal substantive and procedural policy.*" (emphasis included in original); *see also Bulow v. Bulow,* 811 F.2d 136, 140 (2d Cir. 1987) ("The evidence sought … is relevant to both the federal and state claims. In such situations courts consistently have held that the asserted privileges

---

[5] Notes of Committee on the Judiciary, Senate Report No. 93-1277

are governed by the principles of federal law.").

This Court is one of federal jurisdiction governed by the Bankruptcy Code and Federal Rules of Bankruptcy Procedure. A nondischargeability action in a bankruptcy case is a federal question governed by federal statute. There are nondischargeability actions which involve questions of state law where state common law may apply. Conversely, here the underlying fraud involving the Promissory Note Transaction for which Joseph was convicted was a federal question subject to federal laws. Accordingly, federal common law governs privilege in this case.[6]

## Federal Common Law Privilege Exceptions

It is well accepted that all evidentiary privileges should be narrowly construed in the interest of justice. *See EEOC v BDO USA, L.L.P.,* 876 F.3d 690 (5th Cir. 2017); *In re Northwest Senior. Hous. Corp.*, 2023 Bankr. LEXIS 331 (Bankr. N.D. Tex. Feb. 6, 2023); *In re Regan*, 2023 Bankr. LEXIS 302 (Bankr. N.D.N.Y. Feb. 1, 2023); *In re Energy Conservation Devices, Inc.*, 659 B.R. 103 (Bankr. E.D. Mich. 2024) ("Courts apply [attorney-client] privilege only when 'necessary to achieve its purpose' and only to protect legal disclosures that 'might not have been made absent the privilege.' *Fisher v. United States*, 425 U.S. 391, 403, 96 S. Ct.

---

[6] Notably, Defendant's assertions of privilege lack any reference to state or federal common law.

1569, 48 L. Ed. 2d 39 (1976)"); *United States v. Marashi*, 913 F.2d 724, 730 (9th Cir. 1990) ("we have emphasized that we will narrowly construe the marital communications privilege because it obstructs the truth-seeking process.").

### A. Spousal Privilege Does Not Apply to the Business Documents and Business Communications Between Spouses

Communications between spouses are discoverable to the extent that the contents of their communications were communications in furtherance of their business and business-related transactions.

"There are two marital privileges recognized by the federal common law. The first, usually called the 'adverse spousal testimony' privilege, allows a spouse to refuse to testify adversely to his or her spouse. The second, usually called the 'marital communications' privilege, protects from disclosure private communications between spouses. *Griffin*, 440 F.3d at 1143–44 (citations omitted). As in *Griffin*, it is only the second that is at issue in this case." *Veracities PBS v. Strand*, 602 F. Supp. 3d 1354, 1358 (D. Or. 2022). Here, it is also only marital communications at issue but Defendant designated those marital communications as business communications. Marital communications are considered innately privileged and thus are subject to protections. *See generally United States v. Lofton*, 957 F.2d 476, 477 (7th Cir. 1992) ("The marital communications privilege exists 'to ensure that spouses . . . feel free to communicate their deepest feelings to each other without fear of eventual exposure in a court of law.'") (citation omitted); *see also*

*Trammel v. United States*, 445 U.S. 40, 51 (1980) ("information privately disclosed between husband and wife in the confidence of the marital relationship -- once described by this Court as 'the best solace of human existence.'") (citation omitted).

In contrast, business communications between spouses are not innately privileged and "[s]uch communications generally do not fall within the marital privilege." *Strand*, 602 F. Supp. 3d at 1357 ("The Court has identified many cases applying the law of various states and holding that business communications are not subject to marital privilege. *See, e.g., G--Fours, Inc. v. Miele*, 496 F.2d 809, 811 (2d Cir. 1974) (concluding that communications relating solely to business matters are not covered by the marital privilege because the information is not confidential." (citations omitted); *Est. of Crookston v. United States*, 2023 U.S. Dist. LEXIS 226180, *7 ("federal courts have recognized a federal common law exception to marital privilege for business communications, on the theory that such communications are not intended to be confidential.").

Communications between spouses regarding "business matters are not subject to the privilege unless circumstances show the conversations to have been confidential in nature. . . . . It would be improper to shield non-confidential conversations between 'business associates' about business matters solely based on the fact that the 'business associates' are also married." *S. Air Transp., Inc. v. SAT Grp., Inc. (In re S. Air Transp., Inc.)*, 255 B.R. 706, 713 (Bankr. S.D. Ohio

2000) (citing *Hanger Orthopedic Group, Inc. v. McMurray*, 181 F.R.D. 525, 530 (M.D. Fla. 1998); 81 Am. Jur. 2d, Witnesses, § 336). It is appropriate to conclude that since business communications between two non-spousal parties conducting their business together would not be subject to privilege, business communications of spouses who are in business together should not be subject to privilege simply because they are married. Accordingly, the business communications between Joesph and Defendant should not be subject to spousal privilege.

In *Veracities PBS v. Strand*, the U.S. District Court for Oregon tackled the question of whether there is a federal common-law business communication exception to marital communications. *See Strand*, 602 F. Supp. 3d 1354. The *Strand* Court addressed whether a defendants'—husband and wife (the "Strands")—could protect communications that were subject to discovery requests as part a lawsuit against their business Strand Squared LLC. Strand Squared LLC, and the Strands personally, were accused of, *inter alia*, fraud. *See id*. The Strands attempted to withhold more than 10,000 documents from production under the marital communications privilege. *Id*. at 1355. Relying on other courts' decisions and analyses, the *Strand* Court "agree[d] that there exists a federal common law exception to the marital communications privilege for ordinary business communications. Such communications generally do not fall within the marital

privilege because they are not intended to be confidential." *Id*. at 1358. The court in *Strand* further relied the court in *Hanger Orthopedic Group*, reasserting:

> The fact that the communication relates to business transactions may show that it was not intended as confidential. Examples are statements about business agreements between the spouses, or about business matters transacted by one spouse as agent for the other, or about property or conveyances. Usually such statements relate to facts which are intended later to become publicly known. To cloak them with privilege when the transactions come into litigation would be productive of special inconvenience and injustice.

*Id*. at 1358–59 (citing *Hanger Orthopedic Group*, 181 F.R.D. at 530).

To withhold the ESI Files that Defendant attempts to cloak with privilege, "would be productive of special inconvenience and injustice." *Id*. It is undisputed that Defendant was the vice president of DuMouchelle Jewellers and that Joseph and Defendant were the only two members of the company. The Promissory Note Transaction with Plaintiff was contemplated in connection with their business. Emails exchanged among the parties were exchanged on their respective DuMouchelle Jewellers business email accounts. Moreover, the underlying jewelry auction which was intended to repay Plaintiff's Promissory Note was a DuMouchelle Jewellers auction. Hence any records or communications that Defendant has withheld on spousal privilege but that Defendant identified as business-related, were never personal in nature. Furthermore, the communications between Joseph and Defendant will establish the extent of Defendant's knowledge of and/or participation in the DuMouchelle Parties' fraud against Plaintiff.

## B. The Joint Participant Exception to Marital Communications Privilege Avoids Defendant's Assert Privilege

Even if Defendant can guard her business communications with Joseph on the grounds of spousal privilege, spousal privilege does not apply to communications in the furtherance of a crime. Joseph's adjudication of criminality means that the ESI Files that represent communications between Defendant and Joseph in connection with the Promissory Note Transaction and other matters in the criminal proceeding should be produced.

Every United States circuit court—including the Sixth Circuit—recognizes the "joint participant exception" or "crime-fraud exception" and "that the marital communications privilege does not apply to communications having to do with present or future crimes in which both spouses are participants." *United States v. Marashi*, 913 F.2d 724, 730–31 (9th Cir. 1990) ("We have emphasized that the policies underlying the marital communications privilege pale in the face of public concerns about bringing criminals to justice."); *see United States v. Sims*, 755 F.2d 1239, 1243 (6th Cir. 1985) ("where spouses engage in conversations regarding joint ongoing or future patently illegal activity does the public's interest in discovering the truth about criminal activity outweigh the public's interest in protecting the privacy of marriage.").

The joint participant exception can apply equally to civil and criminal cases despite most often being asserted in criminal proceedings. *See Fid. Nat'l Title Ins.*

*Co. v. APM Mgmt. Service's LLC*, 669 F. Supp. 3d 773, 778 (E.D. Mo. 2023) ("the joint participant exception to the marital communications privilege may apply to a civil case, if the Court finds that the facts of that case and the communications support finding that the public's interest in marital privacy is less than its interest in ascertaining the truth of a crime."); *see also Cooksey v. Hilton Int'l Co.*, 863 F. Supp. 150, 151 (S.D.N.Y. 1994) (finding "intentional torts moored in fraud can trigger the crime-fraud exception."). At issue in this Adversary Proceeding is to what extent did the Defendant participate in the criminal fraud committed by Joseph. The facts here fit squarely into the *Sims* Court's description where the "public's interest in discovering the truth about criminal activity outweigh the public's interest in protecting the privacy of marriage." *United States v. Saine*, 2024 U.S. App. LEXIS, *5 (citing *Sims*, 755 F.2d at 1243).

Emails exchanged between Defendant and Joseph (that "hit" on Plaintiff's allowed ESI search terms) have the propensity to be relevant to the Promissory Note Transaction and other crimes at issue in this case. Joseph's criminal case was adjudicated as a criminal fraud against Plaintiff. Therefore, all email communications that have been withheld on spousal privilege grounds should be produced because any such communication is likely to have "[had] to do with present or future crimes in which both spouses [were] participants." *Marashi*, 913 F.2d at 730. If the court does not find that the business communication exception applies,

the Defendant should be compelled to produce all ESI Files withheld on spousal privilege grounds under the joint participant exception.

### C. Defendant Waived Any Applicable Spousal Privilege During the Adversary Proceeding Deposition

In addition to the inapplicability of spousal privilege to the ESI Files at issue, Defendant waived her spousal privilege when she testified regarding the direction she received from Joseph about what she communicated with Plaintiff during the telephone conversation involving Defendant, Joesph, and Plaintiff.

"The marital privilege for confidential communications no longer protected those conversations from disclosure since the plaintiff himself disclosed them." *Bila v. RadioShack Corp.,* No. 03-10177-BC, 2004 WL 2713270 *16 (E.D. Mich. Nov. 22, 2004); *see United States v. Burkhart*, 501 F.2d 993, 995 (6th Cir. 1974) (noting that "[a]ny marital privilege that may have existed was waived when Appellant introduced his wife's statements during cross-examination of the Government witnesses.").

"A waiver of the marital communications privilege can occur if the spouse claiming the privilege herself discloses, or allows the other spouse to disclose, the contents of a particular marital communication." *Jones-Mcnamara v. Holzer Health Sys.*, 2014 U.S. Dist. LEXIS 136132, *6 (S.D. Ohio Sept, 26, 2014). The waiver is limited to "'all communications on the same subject matter.' *Knepp v. United Stone Veneer, LLC*, 2007 U.S. Dist. LEXIS 65423, 2007 WL 2597936, *5 (M.D. Pa. Sept.

5, 2007). As the court stated in *Lien v. Wilson & McIlvaine*, 1988 U.S. Dist. LEXIS 9199, 1988 WL 87067, *2 (N.D. Ill. Aug. 12, 1988), '[w]hen a party freely and voluntarily discloses that it had some privileged confidential conversations, the party cannot assert the privilege as grounds for refusing to identify other occasions when *the same subject matter* was discussed confidentially' (emphasis supplied)." *Id.*

"[T]he marital communications privilege is similar to the attorney-client privilege, which is also subject to waiver through voluntary disclosure of a privileged communication;' *In re Grand Jury Proceedings Oct. 12, 1995*, 78 F.3d 251, 256 (6th Cir. 1996)." *Holzer Health Sys.*, 2014 U.S. Dist. LEXIS 136132, *7. Thus, since Defendant testified regarding the instructions she received from Joseph about what to communicate to Plaintiff about the auction of Plaintiff's collateral and the status of repayment of the Promissory Note, all spousal privilege protections with respect to the Promissory Note Transaction were waived.

During Defendant's Adversary Proceeding Deposition in the Ritter AP—in addition to the waiver of privilege issues raised as to The Yellow Rose Transaction—Defendant testified regarding the Promissory Note Transaction at issue in this Adversary Proceeding and transactions involving Plaintiff. In particular, Defendant testified regarding a partial recording of a telephone conversation

between Plaintiff and Defendant in which Plaintiff, Joseph, and Defendant were

discussing the status of Plaintiff's Promissory Note proceeds. Defendant testified:

**Q.** All right.· So why were you speaking to Ted Gelov?

**A.** Because Joe came over and asked me, said Ted wants to talk to -- wants to talk to us. He didn't warn me. And he came and he said, last minute, Ted wants to talk to us, he's getting his wife Angie on, too, and we're going to all talk. And I said okay.

**Q.** Did [Joe] give you any background on why you were having a phone call?

**A.** No, no. He -- no. From what I think, it was -- I don't remember. He didn't -- he didn't warn me. He came to my desk, from what I think I remember, to my desk and said, Ted wants to talk to us. He didn't warn me. And I was annoyed at that, too. And I said, okay, what -- obviously I was venting about things going on. I don't know why I would have said all that except that I was venting, so -- I believed –

**Q.** All right. Your understanding of this call was that Ted was looking to be paid money, correct?

**A.** Right, right. **[p.172]**

\*\*\*\*\*\*\*\*

**Q.** There might have been a preamble to it, but –

**A.** But is there more of the conversation? Because Joe came to me and I -- this part I do remember, he came to me, he said, Ted -- can you tell Ted how great the auction -- we had just an had an auction -- how great the auction was. **[p.173]**

\*\*\*\*\*\*\*\*

**Q.** Did you know Ted was owed money?

**A.** Joe told me he took out a loan, so -- and then he said Ted said he'd give me more time. And so the way Joe made it sound, like it was no big deal, can you just tell him that we just had a auction, it's going to be little -- no. Yeah, but not -- I didn't think there was an issue paying him. Because obviously, I wasn't keeping track of the bank account, so I didn't – I didn't know . . . . But I think it was right after an auction. And he just said, talk to Ted. **[p.174]**

**Exhibit A**, *Transcript for Defendant's Adversary Proceeding Deposition in the Ritter AP*, pages 172–74, respectively.

As is reflected in her testimony regarding conversations with Joseph, Defendant has waived any applicable spousal privilege in the context of the Promissory Note Transaction.

The communications and records between and among Joseph and Defendant regarding her knowledge of and involvement in the Promissory Note fraud are necessary for Plaintiff to establish that his claims against Defendant should be excluded from dischargeability. The court should compel Defendant to produce all ESI Files she has withheld on the grounds of spousal privilege *if* applicable.

### D. Defendant Waived the Attorney-Client Privilege

The attorney-client privilege is an important and integral piece of United States jurisprudence but as with marital communications it may be waived. This privilege may be implicitly waived when a party voluntarily discloses information that would otherwise be protected by attorney-client privilege. *See In re United Shore Fin. Servs., LLC*, 2018 U.S. App. LEXIS 138, at *3–4 (6th Cir. Jan. 3, 2018) ("The district court correctly concluded that the attorney-client privilege can be

implicitly waived."). The Sixth Circuit went on to clarify that the waiver occurred when a party asserting attorney-client privilege "'attempted to prove a defense by disclosing or describing the attorney-client communications.' *See In re G-I-Holdings, Inc.*, 218 F.R.D. 428, 433 (D.N.J. 2003). Once waived, the privilege is waived with respect to all communications involving the same subject matter. *Id.*'" *Id.*

Defendant waived her attorney-client privilege as to her communications with her Former Counsel when, during her Adversary Proceeding Deposition in the Ritter AP, she testified that she was following counsel's advice to lie about her voice on the telephone recording. Defendant testified:

> **Q.** That's you on the tape, is it not?
>
> **A.** Yes.
>
> **Q.** And at your previous deposition you said it may not in fact have been you. Why did you change your testimony?
>
> **A.** I don't remember saying that.
>
> **Q.** Okay.
>
> **A.** Because my attorney advised me? I don't know. Why would I say that?
>
> **Q.** I'm asking you. Was that Joe on the call?
>
> **A.** Yes.

**Exhibit A**, *Transcript for Defendant's Adversary Proceeding Deposition in the Ritter AP*, page 171.

Therefore, Plaintiff is entitled to obtain Former Counsels' testimony as to Defendant's knowledge and involvement in the Promissory Note Transaction.

Plaintiff addresses attorney-client privilege simply stating no records were designated as communications involving Former Counsel. However, because Defendant waived her attorney-client privilege at the Adversary Proceeding Deposition in the Ritter AP as to her communications with Former Counsel, Plaintiff seeks this court's authority to take depositions and trial testimony of both Dennis Egan and Joel Harris at Plaintiff's discretion.

## III.   CONCULSION

For the reasons set forth in this Brief, Defendant should be compelled to produce all communications withheld on the grounds of spousal privilege. Spousal privilege does not apply to the ESI Files that Defendant designated as business communications between her and Joseph. Even if spousal privilege is applicable to her business communications with Joseph, it does not extend to communications in furtherance of a crime or fraud. Finally, even if spousal privilege applies to business communications and communications in furtherance of a crime or fraud, Defendant waived spousal privilege during her Adversary Proceeding Deposition in the Ritter AP.

Furthermore, as set forth above, Defendant waived her privilege as to communications she had with Former Counsel about the Promissory Note

Transaction, therefore Plaintiff is entitled, within his discretion, to take depositions and elicit testimony at trial from Former Counsel.

WHEREFORE, Plaintiff prays that this court enter an order (1) directing Defendant to produce ESI Files withheld on spousal privilege grounds and (2) authorizing Plaintiff's to depose and/or compel testimony at trial of Defendant's Former Counsel, Dennis Egan and Joel Harris.

Respectfully submitted;

**TAFT STETTINIUS & HOLLISTER, LLP**

By: /s/*Kimberly Ross Clayson*
Jay L. Welford (P34471)
R. Christopher Cataldo (P39353)
Kimberly Ross Clayson (P69804)
Anthony Cimini (P86223)
27777 Franklin, Suite 2500
Southfield, MI 48034
(248) 351-3000
jwelford@taftlaw.com
kclayson@taftlaw.com

*Counsel to Plaintiff, Toedor Gelov*

Dated: January 24, 2025

**EXHIBIT 1**
**(Certificate of Service)**

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:

Joseph G. DuMouchelle and
Melinda J. Adducci,

          Debtors.

Chapter 7

Case No. 19-54531-lsg

Hon. Lisa S. Gretchko

_____/

Thomas T. Ritter,

          Plaintiff,

v.

Melinda J. Adducci,

          Defendant.

Adversary Pro. No. 20-04381

_____/

## CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2025, my office served a copy of the foregoing *Brief (1) in Response to Defendant's Assertion of Spousal Privilege; and (2) in Support of (a) Defendant's Waiver of Spousal Privilege and (b) Waiver of Attorney Client Privilege and Reservation of Rights to Obtain Testimony of Defendant's Former Counsel* by ECF notification to all parties who have filed an appearance in the above-captioned adversary proceeding.

Respectfully submitted;

**TAFT STETTINIUS & HOLLISTER, LLP**

By: /s/*Kimberly Ross Clayson*
Jay L. Welford (P34471)
R. Christopher Cataldo (P39353)
Kimberly Ross Clayson (P69804)
Anthony Cimini (P86223)
27777 Franklin, Suite 2500
Southfield, MI 48034
(248) 351-3000
jwelford@taftlaw.com
kclayson@taftlaw.com

*Counsel to Plaintiff, Teodor Gelov*

Dated:  January 24, 2025

# EXHIBIT 2

## (Adversary Proceeding Deposition Excerpts – EXHIBIT A)

```
 1           UNITED STATES BANKRUPTCY COURT

 2            EASTERN DISTRICT OF MICHIGAN

 3                 SOUTHERN DIVISION

 4   In re:                    Chapter 7

 5   Melinda J. Adducci,       Case No. 19-54531-lsg

 6          Debtor.            Hon. Lisa S. Gretchko

 7   _____/

 8   Thomas T. Ritter,

 9          Plaintiff,

10      -vs-

11   Joseph G. DuMouchelle     Adversary Pro. No. 20-04381

12   and Melinda J. Adducci,

13          Defendants.

14   _____/

15   PAGE 1 TO 185

16

17        The Videotape Deposition of MELINDA ADDUCCI,

18        Taken Via Hanson Remote

19        Commencing at 9:29 a.m.,

20        Monday, September 23, 2024

21        Before Laura Steenbergh CSR-3707, RMR, CRR, RDR

22

23    Court reporter, attorneys & witness appearing remotely.

24

25
```

1    APPEARANCES:

2

3    JAY L. WELFORD P34471

4    KIMBERLY R. CLAYSON P69804

5    Taft Stettinius & Hollister, LLP

6    27777 Franklin Road, Suite 2500

7    Southfield, Michigan 48034

8    (248) 727-1466

9    jwelford@taftlaw.com

10   kclayson@taftlaw.com

11        Appearing on behalf of the Plaintiff.

12

13   PATRICK A. FOLEY P74323

14   John R. Foley, PC

15   18572 Outer Drive

16   Dearborn, Michigan 48128

17   (313) 274-7377

18   pafoley@jrfpc.net

19        Appearing on behalf of Melinda Adducci.

20

21   ALSO PRESENT:      Marc Myers - Videographer

22

23                  *        *        *        *

24

25

HANSON RENAISSANCE  hansonreporting.com
COURT REPORTERS & VIDEO    313.567.8100
20-04172-lsg    Doc 261    Filed 01/24/25    Entered 01/24/25 13:27:20    Page 25 of 29

1      Ted, we promise.

2                  MR. GELOV:  Okay.

3                  MS. ADDUCCI:  Thank you for your patience.  We

4      appreciate it.

5                  MR. GELOV:  Thanks.  Bye."

6                        *       *       *       *

7                  (End of Audio Recording)

8  BY MR. WELFORD:

9   Q.   Ms. Adducci, did you hear all that?

10  **A.   Yes, I did.**

11  Q.   That's you on the tape, is it not?

12  **A.   Yes.**

13  Q.   And at your previous deposition you said it may not in

14       fact have been you.  Why did you change your testimony?

15  **A.   I don't remember saying that.**

16  Q.   Okay.

17  **A.   Because my attorney advised me?  I don't know.  Why**

18       **would I say that?**

19  Q.   I'm asking you.

20                  Was that Joe on the call?

21  **A.   Yes.**

22  Q.   And that was Ted Gelov on the call?

23  **A.   I would -- I'm assuming.  I don't know Ted well enough**

24       **to know his voice.**

25  Q.   Well, you referred to him as Ted.

HANSON RENAISSANCE  hansonreporting.com
COURT REPORTERS & VIDEO  313.567.8100
20-04172-lsg   Doc 261   Filed 01/24/25   Entered 01/24/25 13:27:20   Page 26 of 29

1  A.   Then it would have been Ted.

2  Q.   All right.  So why were you speaking to Ted Gelov?

3  A.   Because Joe came over and asked me, said Ted wants to

4       talk to -- wants to talk to us.  He didn't warn me.  And

5       he came and he said, last minute, Ted wants to talk to

6       us, he's getting his wife Angie on, too, and we're going

7       to all talk.  And I said okay.

8  Q.   And what else did he tell you, Joe?

9  A.   I don't remember.  I don't recall.

10 Q.   Did he give you any background on why you were having a

11      phone call?

12 A.   No, no.  He -- no.  From what I think, it was -- I don't

13      remember.  He didn't -- he didn't warn me.  He came to

14      my desk, from what I think I remember, to my desk and

15      said, Ted wants to talk to us.  He didn't warn me.  And

16      I was annoyed at that, too.  And I said, okay, what --

17      obviously I was venting about things going on.  I don't

18      know why I would have said all that except that I was

19      venting, so -- I believed --

20 Q.   All right.  Your understanding of this call was that Ted

21      was looking to be paid money, correct?

22 A.   Right, right.

23 Q.   And he was looking to be paid money because he had made

24      an investment with you, Joe, DuMouchelle Jewelers,

25      someone, and was looking to be repaid?

1  A.   That's what it appears, yes.

2  Q.   And you advised him of who the buyer was, correct?

3  A.   I don't know what you're saying.  I'm confused.

4  Q.   On the call you were the one that indicated who had

5       bought the items of jewelry.

6  A.   Oh.  Yeah, yeah.

7  Q.   And was making payment, correct?

8  A.   By listening to this, I -- I guess I was in that moment

9       of frustration of trying to figure everything out of

10      what was going on.  Joe -- there's part of that

11      conversation missing, I think.  I think -- is there more

12      of that conversation that we're not hearing?  Because it

13      jumps right in, it doesn't -- is there more of it?

14 Q.   There might have been a preamble to it, but --

15 A.   But is there more of the conversation?  Because Joe came

16      to me and I -- this part I do remember, he came to me,

17      he said, Ted -- can you tell Ted how great the auction

18      -- we had just an had an auction -- how great the

19      auction was.  And I think I had just come from New York

20      or -- I don't remember where I was, but now he's saying

21      that my mom -- now he's saying that my mom was coming,

22      or Joe said that, so maybe I was in Florida.  I don't

23      remember.  But I remember I didn't know that I was going

24      to be on a call with Ted.  And obviously, I was ranting

25      my frustrations of what I was trying to get done.  I

1    didn't know -- if Joe said there was money to pay him, I

2    didn't -- I was not aware that there wasn't enough money

3    to pay Ted, so I was ranting.  I can tell by listening

4    to it.

5 Q.  Did you know Ted was owed money?

6 A.  Joe told me he took out a loan, so -- and then he said

7    Ted said he'd give me more time.  And so the way Joe

8    made it sound, like it was no big deal, can you just

9    tell him that we just had a auction, it's going to be a

10   little -- no.  Yeah, but not -- I didn't think there was

11   an issue paying him.  Because obviously, I wasn't

12   keeping track of the bank account, so I didn't -- I

13   didn't know -- I took in checks during an auction, which

14   was a big deal.  If somebody gave us checks or if I had

15   to call a bank and say -- like, private bank, I had to

16   confirm, you know, with the girls, we all worked on it,

17   but it could have been Joe or myself, Joe can check on

18   it, too, for them to release items.  But I think it was

19   right after an auction.  And he just said, talk to Ted.

20   He didn't give me, like, hey, this is what he -- you

21   know, so I was just telling Ted, like I do, like he was

22   a friend.  I mean, why would I not explain somebody --

23   somebody else's business.  He says he's never had those

24   issues, but I can tell you that I know a lot of people

25   that have had all those same exact issues, so -- with